76 F.3d 385
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Kristina Anne DAHL, M.D., Plaintiff,
and
Ginger Barfield; Susan Thomas; Gino Olivieri; and Cheryl
Gates, Plaintiffs-Appellants,
v.
HEM PHARMACEUTICAL CORP., a Pennsylvania corporation; and
HEM Research, Inc., a Pennsylvania corporation,
Defendants-Appellees.
Kristina Anne DAHL, M.D., Plaintiff-Appellant,
v.
HEM PHARMACEUTICAL CORP., a Pennsylvania corporation; and
HEM Research, Inc., a Pennsylvania corporation,
Defendants-Appellees.
 Nos. 94-16371, 94-16456.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 10, 1996.
Decided Feb. 2, 1996.
 
 Before: LAY,* CHOY, and PREGERSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 I. Factual and Procedural Background
 
 2
 Appellants suffer from the debilitating disease Chronic Fatigue Syndrome ("CFS"). Beginning in 1990 appellee HEM Pharmaceuticals Corporation ("HEM") conducted a double-blind clinical trial of Ampligen, an experimental drug treatment for CFS. HEM selected participants for the study based on the extreme severity of their symptoms.
 
 
 3
 Appellants moved themselves and their families to Charlotte, North Carolina or Incline Village, Nevada. Although the patients could withdraw at any time, if they remained in the study they were required to accept the risks of treatment, forgo other drugs, submit to uncomfortable testing, and not become pregnant. All appellants signed consent forms warning of the experimental status and possible side effects of Ampligen.
 
 
 4
 Prior to entering the study, appellants allege that HEM's agents, Dr. Paul Cheney and nurse Jane Warlick, promised them that after the double-blind phase, all participants would receive Ampligen during an open-label period until Ampligen was FDA approved or until "marketable." Appellants Ginger Barfield, Susan Thomas, Gino Olivieri and Cheryl Gates (collectively the "North Carolina appellants") also allege that they were promised that the open-label dosages would be tailored for each individual patient. Appellants Thomas and Olivieri further allege that they were assured they could receive their open-label infusions in their hometowns.
 
 
 5
 On April 25, 1991, HEM amended the study protocol to reduce the length of the double-blind period from forty-eight weeks to twenty-four weeks. The North Carolina appellants refused to sign a revised consent form so shortening the double-blind period, while Dahl signed the form only after altering it to read that the open-label period would last twelve months instead of twenty-four weeks.
 
 
 6
 After analyzing the study data, HEM applied to the FDA for permission to proceed with a "treatment IND" to allow the use of Ampligen "in the treatment of patients not in the clinical trials." 21 C.F.R. § 312.34(a). The FDA rejected the application due to "serious and potentially life-threatening reactions," but allowed the open-label period to continue. HEM did not proceed with the open-label period, except for "significant responders."
 
 
 7
 After seventeen patients filed complaints and motions for preliminary injunctions, the District Court issued a preliminary injunction ordering HEM to infuse each patient with Ampligen for one year. We affirmed the District Court's order on October 13, 1993. Dahl v. HEM Pharmaceuticals Corp., 7 F.3d 1399 (9th Cir.1993). By the time HEM cooperated with the order, over two weeks had passed, during which time appellants received no Ampligen.
 
 
 8
 On February 1, 1993, the district court granted partial summary judgment against all appellants on their claims of breach of oral contract and breach of the implied obligation of good faith and fair dealing, and against Dahl on her claim of negligent infliction of emotional distress. On July 12, 1994, the district court granted summary judgment against all appellants on all remaining claims. Appellants now timely appeal.
 
 II. Analysis
 A. Standard of Review
 
 9
 We review a grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995). We must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).[1]
 
 
 10
 B. North Carolina appellants' oral contract claims.
 
 
 11
 The North Carolina appellants claim that HEM's agents orally agreed to provide Ampligen until it became marketable, at their homes, and at individually regulated dosages.
 
 
 12
 The starting point for any contractual obligation is the first consent form, which all appellants signed. It states in pertinent part:
 
 
 13
 3. Duration of Participation and Procedures: You understand that you will be in the study for a maximum of twelve (12) months. You understand that you must return to this clinic two (2) days each week for the next twelve (12) months.
 
 
 14
 * * *
 
 
 15
 If statistical analysis of the endpoints show that Ampligen shows efficacy compared to placebo, then following completion of all termination procedures, you understand that if you received placebo on study, you will be offered Ampligen 400 mg twice weekly and will re-enter and follow the same protocol as if you had been randomized to receive Ampligen on study. If you received Ampligen on study, you understand that you will be offered continuation on Ampligen 400 mg twice weekly and will re-enter and follow the same protocol.
 
 
 16
 The parole evidence rule excludes oral evidence when a contract is unambiguous. Oak Island Southwind Realty, Inc. v. Pruitt, 366 S.E.2d 489, 490-91 (N.C.Ct.App.1988); LaLanne v. LaLanne, 279 S.E.2d 25, 26-27 (N.C.Ct.App.1981).
 
 
 17
 Here, the consent form is unambiguous regarding the duration, location and dosage of the open-label treatments. Following the completion of the double-blind period, the patients will "re-enter and follow the same protocol" as the double-blind period. The form states that the double-blind period would last "a maximum of twelve (12) months," and that Ampligen would be administered twice weekly and on-site, rather than at the patients' homes.
 
 
 18
 Interpretation of the form thus turns on the meaning of the term "protocol." The North Carolina appellants must show that "protocol" does not include the duration, location and dosage of the treatments. A protocol is a "precise and detailed plan for the study of a biomedical problem or for a regimen of therapy." Stedman's Medical Dictionary 1155 (24th ed. 1982). A "precise and detailed" plan of the double-blind treatments would necessarily describe the duration, location and dosage of the treatments. Appellants provide no other interpretation of "protocol," but merely assert that the contract is silent. The contract provides that the open-label period will follow the same protocol as the double-blind period: twice-weekly, on-site infusions for a maximum of twelve months. The parole evidence rule thus excludes all evidence of prior oral conversations.[2]
 
 
 19
 The preliminary injunction has already provided the North Carolina appellants all the relief to which they are entitled: twelve months of twice-weekly, on-site Ampligen infusions. The district court properly dismissed their breach of contract claims.
 
 
 20
 C. Dahl's oral contract claim.
 
 
 21
 The oral contract claim of Dr. Kristina Dahl, an Incline Village, Nevada plaintiff, is similarly without merit. When she signed the second consent form, she altered it to explicitly provide that the open-label period would last for twelve months. Any alleged oral promise that the open-label period would last until marketability would contradict the written terms of the contract, and thus violate the parole evidence rule. Crow-Spieker # 23 v. Robinson, 629 P.2d 1198, 1199 (Nev.1981). In addition, Nevada's statute of frauds bars Dahl's oral contract claim, since the alleged agreement could not, by its terms, be performed within one year from its making. Nev.Rev.Stat. § 111.220.
 
 
 22
 D. Dahl's written contract claim.
 
 
 23
 Dahl argues that the district court granted summary judgment against her written contract claim without addressing the merits of the claim. Assuming this to be true, we may nonetheless affirm on any basis the record supports. USA Petroleum Co. v. Atlantic Richfield Co., 13 F.3d 1276, 1279 (9th Cir.1994)
 
 
 24
 As altered by Dahl, her second consent form provides:
 
 
 25
 You understand that you will be in the study for 12 months.
 
 
 26
 * * *
 
 
 27
 If you received Ampligen on study, you understand that you will be offered continuation on Ampligen without charge and will re-enter and follow the same protocol of Ampligen three times weekly for 12 months.
 
 
 28
 (Emphasis added to indicate language inserted by Dahl). Dahl alleges that she should have received Ampligen for twenty-four months, starting at her first injection on April 8, 1991, and continuing until April 8, 1993. Instead, HEM provided Ampligen from April 4, 1991 until September 26, 1991; withheld Ampligen from September 27, 1991 until October 17, 1991; and resumed Ampligen from October 18, 1991 through October 17, 1992, under the preliminary injunction order. Dahl thus alleges two breaches: during the hiatus from September 27, 1991 to October 17, 1991, and from October 18, 1992 to April 8, 1993.
 
 
 29
 The hiatus that occurred in 1991 was not a breach, however, because the contract explicitly contemplated an interruption in treatment before the open-label period. The consent form provides that the open-label period will ensue only after the completion of a statistical analysis showing efficacy. In addition to the time it would take to conduct the analysis itself, the statistical analysis could not occur until all patients had completed the double-blind period. Since the patients began and completed treatments on different dates, stretched out over several months, the "statistical analysis of the endpoints," and thus the open-label period, could not occur until weeks or months after some of the patients completed the double-blind period. A hiatus in treatment was inevitable and expressly contemplated by the consent form.
 
 
 30
 In addition, Dahl fails to establish any damages from either breach. HEM argues convincingly that there is no evidence of any hiatus effect, i.e. that discontinuing Ampligen left the patient worse off than before treatment, or made subsequent treatments less effective. Dahl asserts that three items in the record support the hiatus effect. In her August 3, 1992 deposition, appellant Susan Thomas stated that after being removed from Ampligen, in addition to all the CFS symptoms she had experienced before receiving treatments, she also experienced severe vascular headaches. In her October 21, 1992 affidavit, appellant Dahl states that the year of court-ordered Ampligen treatments had failed to overcome the physical and cognitive decline which her two-week hiatus caused. And in an August 18, 1991 letter to Senator Moynihan, Dr. Daniel L. Peterson, one of two Principal Investigators directing the study, wrote that "it is possible that [Dahl] may not have the same positive response to the drug when reinstituted."
 
 
 31
 The evidence against a hiatus effect, however, is overwhelming. In a November 30, 1992 affidavit, Dr. Peterson concluded that, in retrospect, no evidence supports any hiatus effect:
 
 
 32
 3. Although the patients have provided anecdotal reports of the negative effects of a hiatus, I am not aware of any scientific or medical data or evidence indicating that patients will suffer negative consequences from receiving Ampligen after a hiatus in infusions. Furthermore, I am not aware of any scientific or medical evidence which has established that a hiatus reduces the efficiency upon the recommencement of infusions.
 
 
 33
 4. I am not aware of any scientific or medical evidence to cause me to believe that the removal of any of the above-listed patients from further Ampligen therapy would make their condition worse than it would have been had they never been given Ampligen therapy. Similarly, I am not aware of any scientific or medical evidence to cause me to believe that any such patient would not respond favorably to Ampligen therapy in the future, or that any such patients' [sic] response to future Ampligen therapy would be more or less favorable than the response of a patient with chronic fatigue syndrome with similar symptoms who had never been on the drug.
 
 
 34
 The other Principal Investigator, Dr. David Strausser, and HEM's FDA liaison, John Rapoza, testified at depositions that no scientific evidence indicates that a hiatus effect exists. And Dr. William Carter, HEM's chief scientist in charge of analyzing the Ampligen data, testified at deposition that "[a]ll the rich data in the laboratory and the clinic indicates that phenomenon does not exist." Dahl provides no evidence that a hiatus in Ampligen treatment could have caused the injuries she alleges.
 
 
 35
 In addition, Dahl nowhere alleges any damages from the second breach, which occurred from October 1992 to April 1993. Indeed, in oral argument her attorney apparently abandoned any claim regarding the second breach; he indicated that Dahl received all that she should have received under the contract, an additional twelve months of Ampligen, except that she should have received it without a hiatus. Given Dahl's failure to establish any damages from either alleged breach, the district court properly granted summary judgment against Dahl's written contract claim.
 
 
 36
 E. North Carolina appellants' claim for tortious breach of the implied covenant of good faith and fair dealing.
 
 
 37
 The North Carolina appellants claim that HEM tortiously breached the implied covenant of good faith and fair dealing in denying the existence of a contract and failing to provide the open-label treatment until forced to do so by court order.
 
 
 38
 The district court rejected the tortious breach claim because there is no evidence showing HEM acted oppressively, fraudulently, recklessly or with malice. Cf. Von Hagel v. Blue Cross & Blue Shield, 370 S.E.2d 695, 699 (N.C.Ct.App.1988) (requiring "wilful" or "wanton" action "in conscious disregard of [a] duty" to sustain tortious breach of contract claim). In light of the serious adverse health effects associated with the use of Ampligen found by the FDA, and without knowledge of any clear countervailing benefits from the drug or risks from curtailing the drug, we do not think it was tortious for HEM to stop giving appellants the drug after the FDA rejected HEM's application for treatment IND status.
 
 
 39
 F. Intentional and negligent misrepresentation.
 
 
 40
 Appellants allege that HEM intentionally or negligently misrepresented to them that the open-label period would last until marketability, and that the treatments would be provided at home with individually controlled dosages. The parties agree that the law of Nevada with respect to misrepresentation does not materially differ from the law of North Carolina.
 
 
 41
 The elements of intentional misrepresentation are: 1) the defendant made a false representation relating to some material past or existing fact; 2) the defendant knew his representation was false or made it recklessly without any knowledge of its truth; 3) the defendant intended plaintiff to act upon it; and 4) plaintiff suffered injury as a result of having reasonably relied upon it. See Spartan Leasing, Inc. v. Pollard, 400 S.E.2d 476, 478 (N.C.Ct.App.1991).
 
 
 42
 Appellants fail to allege that HEM made a misrepresentation relating to some material past or existing fact. Instead, they allege that HEM failed to fulfil a promise. "A promissory misrepresentation will not normally support an allegation of fraud." Trull v. Central Carolina Bank & Trust Co., 450 S.E.2d 542, 545 (N.C.Ct.App.1994), rev. denied, 454 S.E.2d 267 (N.C.1995). The only exception to this rule is "where a promissory misrepresentation is made with an intent to deceive the party and at the time the misrepresentation is made defendant has no intention of performing his promise." Id. at 545-46. Appellants provide no evidence that at the time of making the alleged promises HEM never intended to conduct an open-label period.
 
 
 43
 In addition, appellants' reliance on HEM's alleged promises was unreasonable, given that the consent forms described the duration and operation of the open-label period, and did not contain any of the alleged misrepresentations. Dahl's reliance was particularly unreasonable given that she altered her consent form to provide explicitly for a twelve-month open-label period.
 
 
 44
 Appellants' negligent misrepresentation claims fail for the same reasons. First, the alleged misrepresentations are promissory, rather than relating to a past or existing fact, as noted above. Cf. Watts v. Westland Farm Mut. Ins. Co., 895 P.2d 626, 629 (Mont.1995) (under Restatement § 552, negligent misrepresentation must involve a "past or existing fact"). Second, the lack of reasonable reliance bars the claims of all appellants, particularly Dahl, as noted above. Third, the North Carolina appellants' claims fail because North Carolina requires that negligent misrepresentation claims relate to a business transaction and involve pecuniary loss rather than personal injury. See, e.g., Driver v. Burlington Aviation, Inc., 430 S.E.2d 476, 481 (N.C.Ct.App.1993).
 
 
 45
 G. Negligence.
 
 
 46
 Appellants allege that HEM was negligent in pursuing the study without a proper budget, while knowing of the severe potential risks of interrupting the treatments, without disclosing those risks, and then cutting the study in half. The factual record, however, does not support these allegations.
 
 
 47
 First, appellants identify no damages resulting from the allegedly insufficient budget. Second, as the district court noted in its second summary judgment order, "HEM had no way of knowing whether Ampligen was or was not effective in treating Chronic Fatigue Syndrome, much less whether an interruption in therapy would have any effect." More specifically, nothing in the record would have put HEM on notice of the risk of an alleged hiatus effect. Indeed, the only strong evidence in the record supporting the hiatus effect is the letter Dr. Peterson sent to Senator Moynihan, not to HEM. None of the letters sent to HEM warn of any hiatus effect, i.e. the risk that Ampligen would be less effective upon resumption. HEM could not have known of any hiatus risk, and so had no duty to warn appellants of it.
 
 
 48
 H. The district court's denial of leave for the North Carolina appellants to file a fourth amended complaint.
 
 
 49
 The North Carolina appellants argue that the district court should not have denied them leave to file a fourth amended complaint. We review for abuse of discretion. United States v. County of San Diego, 53 F.3d 965, 969 n. 6 (9th Cir.), cert. denied, 116 S.Ct. 183 (1995).
 
 
 50
 The North Carolina appellants fail to explain adequately their delay in amending their complaint. "The fact that present counsel joined this matter in July of 1992 does not explain why previous counsel could not have pursued these issues." District Court's January 22, 1993 Minute Order. The North Carolina appellants now assert that the amendments are based on newly discovered evidence, but this contradicts their earlier assertion that "the facts and other issues of this case remain the same." Motion for Leave to Amend Complaint at 4. In addition, granting leave to amend could prejudice both HEM and the proposed new defendants. If discovery remained closed, the new defendants would have no opportunity to question appellants prior to trial and to present their own defenses. If discovery were reopened, then HEM would suffer the additional time and expense of extended litigation. Moreover, "[t]he timing of the motion [for leave to amend], after the parties had conducted discovery and a pending summary judgment motion had been fully briefed, weighs heavily against allowing leave. A motion for leave to amend is not a vehicle to circumvent summary judgment." Schlacter-Jones v. General Tel., 936 F.2d 435, 443 (9th Cir.1991). Finally, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.1989). Given these factors, the district court did not abuse its discretion in denying the North Carolina appellants leave to file a fourth amended complaint.
 
 
 51
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of the circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Appellants incorrectly assert that the district court blindly relied on the analysis from its preliminary injunction orders, even though the standards of proof at the two stages differ. The district court recognized the different standards of proof, and found that "[e]ven the relaxed standard of review available to the plaintiffs opposing the summary judgment does not save them. The Court's earlier findings are not altered by looking at the facts in the light most favorable to the plaintiffs."
 
 
 [2]
 The North Carolina appellants' promissory estoppel claims fail as well, as North Carolina does not allow the offensive use of promissory estoppel. See, e.g., Home Elec. Co. v. Hall & Underdown Heating & Air Conditioning Co., 358 S.E.2d 539, 542 (N.C.Ct.App.1987), aff'd, 366 S.E.2d 441 (N.C.1988)